UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
THE UNITED STATES OF AMERICA                    11 CR 824 (JS)

    -against                                      HON. JOANNA SEYBERT
                                                U.S. DISTRICT JUDGE

JOSEPH CEFALU

    Defendant
-------------------------------------------------------X


## SENTENCING MEMORANDUM FOR JOSEPH CEFALU


Marc Agnifilo, Esq.
Of Counsel
Brafman & Associates, P.C.
767 Third Avenue
New York, New York   10017
212.750.7800

## Introduction

Joseph Cefalu is a gentle, kind, humble man who has devoted his life to his wife and three children.  A jeweler by trade, he has built an honest jewelry business from a modest store in Huntington, New York, where he and his wife, and, at times, their children, work long hours.  They are valued neighbors and friends to everyone in the community.  As a neighborhood jeweler, Joseph[1] is involved in more than his share of joyous occasions.  People come to his store when they are to be married, or when a child or grandchild graduates, or when they save for an extra special present for a loved one.  This is his life – hard work, time with his family, and being lucky enough to have a job providing treasured items to smiling people during times of happiness.

The offense conduct involves a friend, someone Joseph has known for many years.  The Cooperating Witness (CW) and his family were very close with Joseph.  The conduct at issue began ten years ago, in 2004, when the CW came to Joseph and asked for a loan.  Joseph had never lent money to another person before and the CW came to him as a friend in need of financial assistance.  Eventually, Joseph agreed make a series of loans to the CW.  The interest rate on the loans, which was set by the CW himself, was unlawfully high.

---

[1] Because Joseph's brother, Dominic, is a co-defendant, counsel will refer to Joseph Cefalu throughout this submission as "Joseph," or at times "Cefalu."  Dominic Cefalu will only be referred to as "Dominic Cefalu."

Seven years after the CW first approached Joseph for a loan, Joseph was arrested on this case. While this case does not involve violence or force, and even though the loans between the CW and Joseph were between friends, the interest rate alone makes the loans illegal. Joseph pleaded guilty to his involvement in collecting this unlawful debt on June 28, 2013.

He now submits this sentencing memorandum in which he asserts that under the particular facts of this offense and given his personal circumstances, a non-incarceratory sentence is reasonable under Title 18, United States Code, Section 3553(a). He asks this for a five principal reasons. First, there was no force or violence in connection with this offense, nor was the offense related to organized crime. Second, to the extent that the rate of interest was usurious, this rate was set by the purported victim himself, and agreed-to by defendant Joseph Cefalu. Third, Joseph Cefalu is not in the business or habit of lending money to others, and did so here only because the CW, a long-time acquaintance, repeatedly asked for a loan. Fourth, as to the characteristics of the defendant, the offense conduct is old, and defendant has not engaged in any unlawful activity for the past 8 years. Fifth, Joseph Cefalu is a peaceful, law-abiding, gainfully employed family man who should not be taken from his job, his family and his life to serve a prison sentence on this conduct given the particular facts of this case.

## Statement of Facts

Joseph Cefalu pleaded guilty to loaning money to a long-time friend, the CW, on which the CW proposed, and voluntarily paid, an interest rate that was illegally-high because it was more than twice the legal rate of interest in the State of New York.  Even though it was the CW himself who set the interest rate that made the loan illegal, under the law, Joseph is legally guilty, and he pleaded guilty.  There is no evidence that Joseph used violence or threats of violence or force in the collection of the loans, nor is there evidence the loans was forced upon the CW.  Rather, it was the CW who asked for the loans and determined their terms, including the rate of interest that he would pay.

A.   Background On The Relationship Between the Cefalus, the CW and the CW's family

In order to understand the circumstances surrounding this series of loans, it is necessary to first understand the business and personal relationship between Joseph Cefalu and the CW.   Joseph Cefalu and his family have been long-time friends with the CW's family.  When Joseph Cefalu was in high school, his football coach and physical education teacher was the CW's father. Years later, in about 2002, the CW's brother, Peter, contacted Joseph, who at that time was working at Devin Jewelers, to purchase a diamond engagement ring.  Peter and Joseph Cefalu spent a great deal of time together discussing diamonds and engagement rings, and the two became closer friends.  In

addition to engagement rings, the two men discussed where Peter and his fiancée , Laura, would hold their wedding reception.  That Joseph Cefalu helped Peter with his ring and wedding reception, caused Joseph Cefalu to become closer with the CW's family.

As set forth in detail below, the close relationship between the CW's family and the Cefalu's was not terminated by this case or the fact that the CW wore a wire.  The CW's family continues to buy jewelry from Joseph Cefalu's store and refers potential jewelry customers to him.  Moreover, the CW's family continues to periodically visit Cefalu and his jewelry store.  So, when this Court passes on an appropriate sentence for Joseph Cefalu charging an excessive interest rate to the CW, the fact that the families remain close, and that the CW continues to pursue a friendly relationship with Joseph, are relevant.

B.   Joseph Cefalu Enters "Finders Fee" Arrangement with the CW

In about 2003, the CW's father, Anthony, Sr. who, as noted, was also Joseph Cefalu's former football coach, came to Devin Jewelers to speak with Cefalu.  Anthony told Cefalu that Anthony's son, the CW, owned a mortgage company called Destiny Funding, and asked for Cefalu's help with generating business for his son.  Anthony observed that many people who came to Cefalu for rings were young couples getting married and that many of them may need a home mortgage.  He offered Cefalu a "finders fee" for young couples that Cefalu directed to the CW for home mortgages.

In reliance on this agreement, Cefalu spoke to young couples buying engagement rings about Destiny Funding, and for those couples securing mortgages, the CW gave Cefalu a finder's fee in cash which Joseph declared as taxable income.  These cash commissions were not sizeable but they were steady – between $250 and $1000 per month.  Because Cefalu was not making much money from the jewelry business, he looked for opportunities to increase his income from Destiny Funding.   Cefalu had a friend, who was a construction contractor in the business of home-renovation.  Cefalu referred the construction contractor to the CW.  This resulted in many home mortgages for Destiny and enhanced commissions for Cefalu.

C.     CW Asks Joseph Cefalu For Loans And Proposes "Two Points"

In about 2004, the CW called Joesph Cefalu and said he was desperate to meet him. The two met at a location near the jewelry store where Cefalu was working.  At this meeting, the CW asked Cefalu for a $50,000 loan. Cefalu did not want to lend the CW the money and couldn't understand why the CW needed the loan.  From Cefalu's perspective, the CW was making a great deal of money, he drove an expensive car, and the CW's company, Destiny, seemed successful.  At first, Cefalu refused the request.  However, the CW persisted, saying that it was a short-term loan for the purpose of buying foreclosed properties that would be quickly resold.  The CW maintained that the $50,000 would translate into a swift, substantial return.  So, Cefalu agreed to loan the

5

money but he wanted to be a (5%) partner in Destiny Funding, the CW's business. Initially, the CW flatly rejected Cefalu's proposal to have an interest in Destiny. Rather, the CW was adamant that he wanted the loan without having to provide collateral based on the long-term relationship between the two men and their families.

Cefalu reluctantly agreed to loan the CW the $50,000 without taking an interest in Destiny. However, he told the CW that he wanted the money repaid as soon as possible. After about three months, the CW gave Cefalu about $55,000 on the $50,000 loan. During this time, the business relationship between the two men grew stronger. In addition, Cefalu had grown closer with different members of the CW's family, many of whom came to him to purchase jewelry.

During this time period, the CW had been encouraging Cefalu to refinance the loan on his home to take advantage of low interest rates. In about 2004 or 2005 Cefalu refinanced the loan on his home. Knowing that Cefalu was refinancing his loan, the CW asked Cefalu to take out an extra $25,000 that Cefalu would loan to the CW. Cefalu agreed to this, and on about January 25, 2005, Cefalu sent a wire transfer to the CW in the amount of $25,000, the proceeds having come from the refinance of his home.

In addition to the $50,000 loan and the $25,000 loan, the CW asked Cefalu for numerous smaller loans throughout 2004 and early 2005. The total

amount of these smaller loans was $195,000.  Due to the large sum of these smaller loans, Cefalu asked the CW to sign a promissory note.  On February 1, 2005, a promissory note was signed.  In the beginning, the CW was not paying back any of this loan, however, Cefalu believed he was secure because the CW represented that he had millions of dollars in equity and owned two large parcels of real estate.  Also, Cefalu had the written promissory note.

When Cefalu asked the CW to start repaying the loans in periodic installments, the CW suggested that the CW would pay the loans back with "two points" (two percent of the principal per week).[2]  The CW said he suggested this rate of repayment because he believed he could pay back the loans at this rate.  Joseph Cefalu agreed to this arrangement.

D.    Cefalu's and the CW's Business Interest

Cefalu and the CW had an agreement with a home improvement company, which had a home mortgage division, where they took referral fees from new and refinanced mortgages they directed to the company.  In particular, Cefalu, the CW and the company agreed that on all new and refinanced mortgage loans the new company secured through the efforts of Cefalu or the CW, Cefalu would take 10% and the CW would take 20%.

The relevance of this business, which was completely lawful, was that it provided a form of financial security to Cefalu even though the CW was slow

---

[2] For instance, two points on a $195,000 loan would be $3,900 per week.

in paying back the outstanding loan. This was so for two reasons: first, since Cefalu and the CW had an ongoing business relationship, it was less likely the CW would simply refuse to pay back the loan. Second, since Cefalu saw that the CW was making money from the mortgage referrals, he was more confident the CW would eventually pay him in full.

E.      The CW's Drug and Gambling Problems Cause Him To
        Fall Behind In Paying His Debt

Despite the large amount of money the CW appeared to be making, he consistently said he was unable to pay his debt to Cefalu. Cefalu, a devout family man, who doesn't go out at night, drink, gamble or engage in any other vice, learned that the CW was going out at night and squandering his money. At first, Cefalu did not know the details. However, at some point, the CW's father approached Cefalu and asked if Cefalu could "keep an eye" on his son. The CW's father said his son was running around "like a playboy," was drinking and spending all of his money. Cefalu told the father he would try to watch over the CW, and he did so. Cefalu learned from someone close to the CW that the CW was heavily using illegal drugs and that he had a serious drug problem.

Cefalu was not fully aware of the CW's gambling problem. Joseph Cefalu had introduced the CW to co-defendant Frank Lonigro when the CW stated he wanted to refinance a loan. However, the CW had begun gambling

with Lonigro as well as co-defendant Gerrato, and had come to owe them a certain amount of money.[3]  Until learning of the CW's gambling and drug problems, however, Cefalu did not realize the extent of the CW's difficulties. Cefalu confronted the CW with the information about his drug use, and the CW emphatically denied using illegal drugs .  Cefalu, not believing the CW's denials, asked for his money back – a total of $220,000 based on the $195,000 in smaller loans and the $25,000 outstanding loan from the home refinance. The CW said he did not have the money, but that he would pay Cefalu back at a rate of $2,500 per week until the full balance was repaid.  The fact was that even though the CW had suggested paying "two points" on the loan, he rarely paid that amount.

For a few months, the CW appeared to make genuine efforts to repay this debt.  However, after that, the $2,500 weekly payments stopped, and the CW made sporadic payments in lesser amounts – between $500 and $1,500. Nonetheless, Cefalu was still making commissions from the mortgage company that came through the CW.  So, while Cefalu was concerned that the CW, whom he believed had a drug problem, owed him a great deal of money and wasn't paying in a timely fashion, his concerns were tempered by the fact that the mortgage business was reasonably profitable.

---

[3] The PSI indicates that the CW owed $150,000 in gambling debts to co-defendant Lonigro and $300,000 in gambling debts to co-defendant Gerrato.

Despite his frustrations with the CW, Cefalu enjoyed a warm, friendly, positive relationship with the rest of the CW's family. He saw them on holidays, often bringing gifts and cake. When Cefalu's daughter won a scholarship to play soccer at the College of the Holy Cross, the CW's father, the former Athletic Director of her High School, personally congratulated her. In sum, the relationship between the Cefalu's and Cerullo's was warm, close and friendly.

2006, however, was a tough year for the CW. From Cefalu's perspective, the CW's life was out of control. He was going out at night, he seemed to be using drugs, and he became more and more unreliable and evasive in his business dealings. At the same time, the mortgage industry was becoming more volatile and less profitable. In light of this, Cefalu encouraged the CW to downsize his business – to take less office space and decrease expenses. The CW refused to do this, maintaining that he had an image to project.

One Friday in the Fall of 2006, the CW was arrested on Long Island. While Cefalu never learned the specific details, the CW apparently had some type of drugs in his car. That weekend, Cefalu and his wife were on the way to the College of the Holy Cross in Worcester, Massachusetts to watch his daughter's soccer game. However, the news of the day was the CW's drug arrest. The CW's father called Cefalu to tell him that he (CW's father) had

10

invested all of his savings from his career working in the Elwood School District in his son's company and now it all seemed lost.

Following the CW's arrest, he and Cefalu remained close, despite Cefalu's disappointment. Cefalu saw that the CW was struggling to keep his mortgage business and was determined to help him. In late 2006, the CW asked Cefalu to sell his wife's engagement ring. Cefalu sold the ring for about $20,000. Even though the CW owed Cefalu over $200,000 as of this time, Cefalu gave the full amount of money from the ring to the CW. When people asked Cefalu why he didn't keep some portion of the money from the ring, his response was always that the CW needed the money more than he did.

Soon after his arrest, the CW stopped making payments to Cefalu. Between 2008 and 2010, Cefalu and the CW barely spoke. When they did speak, it was because Cefalu knew the CW was going through a hard time and wanted to know how he was.

After Cefalu's arrest in this case in December 2011, the CW's brother came to see him. However, on advice of counsel, Cefalu did not speak to the CW's brother, who said that he had only come by to wish Cefalu's wife and Cefalu and their family a merry Christmas. What is significant about this event is that even after it was known that the CW had worn a body wire and caused Cefalu to be arrested, the CW's family and Cefalu continued a warm, close relationship. That relationship continues to the present day. Indeed, in

November 2013, members of the CW's family contacted Cefalu, said they had fallen on hard financial times and asked whether they could sell a diamond they owned to Cefalu. It is expected that even when this case is over, the Cefalus and the family of the CW will continue to be close. Certainly, the fact that the CW's family continues to be close with the defendant and his family is relevant to the nature of the offense and the defendant's personal character.

### Joseph Cefalu's Prior Offense

In December of 2008, Joseph was charged with Criminal Contempt in connection with a Grand Jury Subpoena issued by the Suffolk County District Attorney. Specifically, the Suffolk County D.A. had been conducting an investigation into a gambling and loansharking ring, which led to the arrests of 24 people in 2006, including co-defendants Frank Lonigro and Salvatore Gerrato. Joseph, who had not been arrested, received a Grand Jury subpoena to provide testimony against others. Concerned about possibly implicating himself or others, Joseph refused to answer questions posed by the prosecutor in the Grand Jury. He pleaded guilty to being in criminal contempt through his refusal to answer questions and was sentenced to a term of five years probation. After three years on probation without incurring any violations, he was successfully discharged.

A primary reason he chose to not answer the District Attorney's questions in the Grand Jury was because it was well-known that the FBI and

U.S. Attorney were conducting a parallel or related investigation.  Therefore, even if he received complete transactional immunity under the laws of New York, he would not, and could not legally, be given transactional immunity under federal law.  As history would show, through the arrests in this case, Joseph's suspicions of a federal investigation into similar conduct would prove to be true.

Because of the specific circumstances of the prior Suffolk County case, and its relationship to the present case, this Court should not, most respectfully, view this prior conviction as an aggravating factor.

### The Guilty Plea In the Instant Case

On June 28, 2013, all four defendant pleaded guilty to the crime of Conspiracy to Collect an Unlawful Debt in violation of Title 18, United States Code, Sections 1962(c) and (d).  Two features of the guilty plea are particularly relevant to the court's consideration of the offense conduct.

First, Joseph Cefalu did not, nor did the other defendants, plead guilty to collecting an unlawful debt as part of an alleged association with the Gambino Crime Family.[4]   At the time of the guilty plea, co-counsel Eric Franz offered a factual clarification pertinent to all defendants:

---

[4] At the time of the filing of this Sentencing Memorandum, counsel has not been provided with the addendum to the Pretrial Services Report.  Counsel has objected to the inclusion of any reference to the Gambino crime family in the offense conduct.

Mr. Franz: "Everybody is preparing to allocate that they made an agreement with a group of individuals that were associated in fact, which they understand by law constitutes an enterprise.

The Court: "correct"

Mr. Franz: "What they don't adopt is every word that would be considered gratuitous in the indictment that this was the Gambino family.  They don't adopt that vernacular but they agree, and they will be able to satisfy the statutory elements, that they formed an association in fact which constituted an enterprise and engaged in the predicate conduct which formed the basis for…"

The Court: "racketeering"

Mr. Franz: "racketeering, that's correct."

The Court: "Is that your understanding?"

Mr. Toosi:  "That is my understanding, your Honor."

In light of the understandings between the Government and defense counsel, Joseph Cefalu is not being sentenced as an associate of an organized crime family, but merely as someone who asked for the help of his brother in regard to the outstanding debt of the CW.

The second aspect of the guilty plea that is relevant to a reasonable sentence is that no violence, threats of violence or force was used in order to prompt the CW to repay the debt.  Rather, as was also made clear during the plea allocution, See Transcript of Plea Allocution, June 28, 2013, p's 14 and 15, the sole basis for the loan being illegal was the unlawfully high rate of interest on the loan.

## Guidelines Calculation

Defendant accepts the calculation set forth in the PSI: (a) base offense level of 19; (b) reduced by 3 levels for a timely plea; and (c) reduced one additional level per the plea agreement, for a final adjusted level of level 15, for a range of between 18 and 24 month of incarceration.

## A Non-Incarceratory Sentence Is Reasonable

This Court is fully familiar with the principles of Section 3553(a) and with the Supreme Court's precedents over the last decade on the role of the U.S. Sentencing Guidelines.[5]  In particular, there are five primary reasons for a non-incarceratory sentence. The first three are relevant to the nature of the offense while the last two are relevant to the character of the defendant.

First, there was no force or violence in connection with this offense, nor was the offense related to organized crime.  Second, to the extent that the rate of interest was usurious, this rate was set by the purported victim himself, and agreed-to by defendant Joseph Cefalu.  Third, Joseph Cefalu is not in the business or habit of lending money to others, and did so here only because the CW, a long-time acquaintance, repeatedly asked for a loan.  Fourth, as to the characteristics of the defendant, the offense conduct is old, and defendant has

---

[5] A treatment of relevant statutory and case law on the topic of the role of the Guidelines after the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005) is set forth in the sentencing memorandum of Dominic Cefalu, pages 6-8.

not engaged in any unlawful activity for the past 8 years. Fifth, Joseph Cefalu is a peaceful, law-abiding, gainfully employed family man who should not be taken from his job, his family and his life to serve a prison sentence on this conduct.

    1.  <u>There Was No Force Or Violence In The Offense</u>

As set forth in the statement of facts, the first loan was in 2004, when the CW asked for, and received, a $50,000 loan. After paying that back, the CW asked for a $25,000 as well as a series of smaller loans totaling $195,000. At no time did Joseph Cefalu use force or violence in seeking repayment. On the contrary, when the CW's life became difficult through drug use and gambling, Joseph Cefalu remained his friend, and gave him the time he needed to pay back these loans. It should be noted that the CW still owes Joseph Cefalu about $50,000 on these loans over 8 years later.

Also, as established clearly during the plea allocution, this offense was not related to organized crime, nor to Joseph Cefalu's connection to any organized crime family. The relevant enterprise is not the Gambino family, but merely a group of people associated in fact. Also, as shown by the particulars of the offense conduct, the driving force behind the loans was the personal relationship between Joseph Cefalu and the CW, and not any other factor.

    2.  <u>The Usurious Interest Rate Was Set By The CW</u>

As was also indicated in the statement of facts, the interest rate, which was admittedly unlawfully high, was set by the CW himself. When the CW was slow in paying back these loans, the CW suggested paying Joseph Cefalu two points per week. Nonetheless, the CW rarely paid this rate of interest, paying instead whatever amount he could afford at the time.

Certainly, the fact that the CW set the unlawful interest rate does not render the conduct legal on the part of Cefalu, who clearly accepted this interest rate. But, it does serve to mitigate the nature of the offense.

3.  The CW Was The Only Person To Whom Cefalu Loaned Money

Had Joseph Cefalu been in the business of loaning money, one would expect usurious loans extended to numerous people. However, he is not in such a business. The only person he loaned money to was the CW, and this was for the simple reason that the CW is the only person who ever asked him for a loan.

As set forth above, Joseph Cefalu is a jeweler. This is his trade; he and his wife run a reasonably profitable store. He has no need of making money by lending money to anyone, including the CW. Moreover, to the extent that he sought to supplement his income from the jewelry business back in 2004 and 2005, he and the CW had the home improvement company. Simply put, Cefalu did not extend these loans to the CW as commercial endeavors. Rather, he did so because the CW asked him to do so.

17

4. <u>The Offense Conduct Relates To Conduct from 2004 to 2006</u>

As noted, the loans to the CW were in 2004 and 2005. After the CW's arrest in 2006, he stopped paying back on the loans. So, the offense conduct relates to actions that are between 8 and 10 years old. It is also noteworthy that these tape recordings, comprising the evidence against Cefalu, have been in the possession of law enforcement since they were made in 2006, the same year the CW agreed to cooperate.

Aside from these loans and the Suffolk County matter, which also related to these events, Joseph Cefalu has led a completely law-abiding life. He should not be sentenced to prison on this conduct, which represents an isolated chapter in his life from more than 8 years ago.

Since the time of the offense conduct, Joseph and his wife have opened their own jewelry store and have grown that business. The jewelry store, located in a small, tasteful shopping mall in Huntington, Long Island is the pride of the Cefalu family and of the neighborhood. Indeed, the store is a testament to the value of family-owned local businesses that provide personalized customer service to a clientele that has been loyal to that business for years. It would be a shame to disrupt such a wonderful, hard-earned business enterprise over the offense conduct in this case.

5. <u>Cefalu Is A Law-Abiding, Gainfully-Employed Family Man</u>

Possibly the most compelling aspect of this case for the defense is the defendant himself.  There are few people who are kinder, gentler and more decent than Joseph Cefalu.  He is a consummately humble man.  He works hard in the jewelry store; he is in love with his wife; he is proud of his three children; and he takes very good care of his family.

His oldest son, Riccardo, is 29 years old.  He holds a Bachelor's degree in Science from SUNY Farmingdale.  He may one day pursue a career in health and medicine, but for today, he works hard in the jewelry store.

His second son, Joseph, is 28 years old.  A graduate of the Culinary Institute of America, he has been a chef at many restaurants around the country.  Currently, he is the head pastry chef at Heartwoods in New York City.

His daughter, Justine, is 26 years old.  She took and passed the New York State Bar Examination last summer and has started her career as a lawyer with a firm in Nassau County.  She played Division One Women's Soccer at a highly competitive level at the College of the Holy Cross in Worcester, Massachusetts.  As an outstanding college student and scholar, she was named to the "Patriot League All Academic Team."  She is currently studying for the Florida Bar Examination, which she will sit for next month.

Joseph and his lovely wife have been married for over 30 years.  His life is his family and his work.  To know this man is to love him, and to see the love and success he has created in his life is to recognize that sometimes good things do happen to good people.

Joseph Cefalu stands before this Court because he admits that he did something wrong.  However, given the particulars of the offense conduct, as outlined above, and given the wonderful character of this man, we humbly ask this court to not send him to jail.  He doesn't belong in jail.  He belongs with his family, waking up early, working at his jewelry store and continuing to be a loving husband and a guiding light to his delightful children.

CONCLUSION

For the reasons set forth above, and pursuant to Title 18, United States Code, Section 3553(a), the Court should impose a non-incarceratory sentence on Joseph Cefalu.

Respectfully submitted,

Marc Agnifilo, Esq.
Of Counsel
Brafman & Associates, P.C.
767 Third Avenue
New York, New York  10017
(212) 750-7800

To:    All Counsel (via ECF)